UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

v.                                             Case No.: 8:25-cr-19-WFJ-TGW

JAMES OXLEY
_____:

**SENTENCING MEMORANDUM**

    Rarely does one land before a federal criminal court free of some degree of a checkered past. While many defendants share the common theme of having committed a crime and are now paying their dues, often the similarities amongst those charged end there. Some charged are kingpins, consistently injecting society with harmful substances, guarding their products with violence; possessing little regard for their fellow man. Others are followers, perhaps admirers of those in control of a drug organization, willing to take on the dirty work of the upper echelon. Enforcers, bodyguards, or muscle, many are willing to do what it takes to rise through the ranks of an organization, or at a minimum, curry favor with the person in control of the money. Some are addicts, doing what they are told to receive their next fix.

    With sex cases there is always the wonder of how a person gets to where they are. What happened in their lives to create either a diagnosis of pedophilia or the never-ending morbid curiosity that seems to grip so many. It's incredibly hard to fathom; why would someone be compelled to search, view, or keep child pornography? Why do some seem to react so well to treatment while others continue to struggle. It stands to reason that eventually science will produce these answers for us but what I do believe has some merit is that many who come before our court system struggle with a mental health affliction related to this topic; some succeeding in treating it, others who don't, and many of whom likely needed more or different aid than what

they received. Frankly, it is undersigned counsel's belief that part of Mr. Oxley's issue has been lack of qualified treatment and lack of completed treatment. While not a direct comparison, it stands to reason that if there is an affliction that goes untreated or is treated inappropriately, that affliction will fester rather than heal.

Mr. Oxley is before this court in a very precarious situation; now having pled guilty to child pornography related charges for the second time. Candidly, many arguments proffered by defense counsel on these kinds of charges are harder to make the second time around. What we would ask this Court to indulge is in is the fact that Mr. Oxley's probationary period on his first case in State court was cut short. As such, his court ordered sex offender treatment was cut short. As referenced above, the root, or why, behind his having child pornography was never adequately addressed and as such, his probability of recidivating was always going to be increased.

Mr. Oxley is before this Honorable Court, a shamed man. Without a doubt, the crime is a serious one. Mr. Oxley more than anyone knows he has done wrong. Mr. Oxley committed this crime. Mr. Oxley admits his wrongdoing. Now, Mr. Oxley respectfully submits this sentencing memorandum for this Honorable Court's consideration. Mr. Oxley requests that this Court impose a sentence that is sufficient but not greater than necessary to appropriately punish for the crimes committed, while being able to offer rehabilitation from both a mental health standpoint generally and to get Mr. Oxley the sexual deviance treatment he has needed for quite some time. Mr. Oxley respectfully requests this Court consider and determine that a bottom end guideline sentence is appropriate under 18 U.S.C. § 3553.

## STATEMENT OF FACTS

*Factual Synopsis*

1. On December 22, 2024, while returning from a cruise, Mr. Oxley was detained by customs at the port of Tampa where it was found that he had child pornography on his cell phone.

2. Such child pornography was found on his phone in a 'recently deleted' file, a file that acts as a final temporary safety net for deleted images.[1]

3. Mr. Oxley had been on a cruise travelling from Tampa to Mexico and back. Upon questioning by HSI agents he admitted knowledge as to the images on his phone.

4. Ultimately Mr. Oxley was taken into custody without incident related to the 191 images and nine videos retrieved.

*Procedural History*

5. Mr. Oxley pled guilty to all counts of his Indictment in an open plea on September 17, 2025.

6. On October 3, 2025, this Honorable Court accepted Mr. Oxley's guilty plea and adjudicated him guilty.

7. This case is presently set for sentencing on December 18, 2025.

*Advisory Guideline Calculation*

8. The Presentence Report (PSR) calculates Mr. Oxley's total offense level as a level 37 with a criminal history category of I. PSR at ¶ 35 and 40. Mr. Oxley's offense level suggests the guideline imprisonment range be 210 to 262 months. PSR at ¶ 74.

---

[1] Images in recently deleted files remain on the phone for 30 days after deletion. https://support.apple.com/en-us/104967

## MEMORANDUM OF LAW

This memorandum examines the issue of whether a sentencing range of 210 to 262 months is in fact sufficient, but not greater than necessary, to comply with the sentencing directives laid out in 18 U.S.C. § 3553(a)(2). An examination of section 3553 is critical in the instant case since many of its sentencing factors supports Mr. Oxley's request for a low-end guideline sentence. *See* 18 U.S.C. § 3553(a).[2]

### I.   *Koon and its Progeny Provides the Court with the Discretion to Impose a Variance under 18 U.S.C. § 3553(a).*

Congress set forth Sentencing Guidelines to guide the courts in determining a just and predictable sentence. However, the Supreme Court has made it clear that sentencing discretion remains with the district judge, so that each convicted person may be considered individually, and their case treated as a "unique study in the human failings that sometime mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Congress has expressly affirmed a judge's discretion to consider the fullest information possible. *See* 18 U.S.C. § 3661.[3] Pursuant to *United States v. Booker*, 543 U.S. 220, 744 (2005), a court is now unencumbered in its ability to "maintai[n] sufficient flexibility to permit individualized sentences when warranted." A court is expected to consider the Sentencing Guidelines but may order any sentence deemed to be reasonable. *Id*. at 745.

To guide a court's discretion, section 3553(a)(2) requires sentencing courts to consider not only the advisory Guidelines range, but also the facts of a specific case through the lens of

---

[2] Undersigned counsel is characterizing the 180-month sentence as a varied sentence as there is still a pending objection to Mr. Oxley not receiving a two-level reduction for not trafficking or distributing the CSAM.
[3] "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

several factors such as but not limited to: the nature and circumstances of the offense, the defendant's personal history and characteristics, and the need for deterrence. Against this backdrop of factors, Mr. Oxley respectfully submits that a bottom of the guideline sentence is warranted in his case. As the following sections demonstrate, a bottom of the guideline sentence would be sufficient, but not greater than necessary, to satisfy the purposes of § 3553(a). *See, Pepper v. United States*, 562 U.S. 476 (2011) (a "sentencing judge's overarching duty under § 3553(a) [is to] to impose a sentence sufficient, but not greater than necessary"). As this memorandum establishes, applying the factors of § 3553(a) to Mr. Oxley's case supports the imposition of a bottom of the guideline sentence.

1. **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.**

<u>Nature and Circumstances of the Offense</u>

Mr. Oxley was charged via indictment with Transportation and Possession of Child Pornography, in addition to one count of Possession of an Obscene Visual Depiction of a Minor Engaging in Sexually Explicit Conduct, for which he pled guilty pursuant to an open plea on September 15, 2025. Such resolution was secondary to Mr. Oxley being detained by Customs and Border Patrol at a secondary level inspection due to him previously being registered as a sex offender. Upon his detainer, Homeland Security agents interviewed Mr. Oxley and he admitted to being in possession of and previously deleting Child Sexual Assault Material. He was taken into custody and ultimately pled to all counts he was charged with

<u>The History and Characteristics of the Defendant</u>

The significance of a person's history and their individual characteristics lies in the comprehension that a court should not solely focus on a defendant's crime in determining his

sentence. Rather, a court must consider the offense against the backdrop of a defendant's life. The Supreme Court has emphasized "[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Pepper v. United States*, 562 U.S. 476, 488 (2011) (citation omitted). Consistent with this perspective, one federal jurist has concluded:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics' of the defendant.

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-514 (S.D.N.Y. 2006) (Rakoff, J.).

The tenet in *Adelson* that a defendant's criminal conduct must be measured against his overall life has resonance in the instant case. The *Adelson* Court contemplated a balance of an individual's misgivings versus their good will, but also there is relevance found in the struggles an individual has endured in their lifespan. All in all, we are the sum of our life's experiences, good, bad, wonderful, horrific; all the same. While there is no sense in trying to link a 'but for' causation between experiences and the commission of crime, like anything else, decisions are impacted by a person's health which in turn is often influenced by their life's struggles.

Mr. Oxley is a 53-year-old man with a long history of familial dysfunction. From the time he was a child he has lacked stability and feeling of belonging due to the consistent abuses he received at the hands of his parents. Growing up a Jehovah's Witness (hereinafter "JW"), Mr. Oxley's life was one of restriction, carrying the dictate that he abide by his community's very strict rules or suffer the consequences. In the time of his life when he needed the most guidance,

shelter, and affection, the one place that should have come from, lacked. Any misstep or childlike disobedience was met with harsh physical retaliation. Not corporal punishment in the sense of spanking, punishment that led to scarring on his back, hands, and other parts of his body. Most of the abuse came at the hands of a father more interested in maintaining respect in the JW than fostering a loving environment for his children. The family dysfunction was so bad that on one occasion while performing household chores, Mr. Oxley hurt his hand and said, "oh frigg." His father, believing he said, "Oh fuck," responded by beating him; eventually throwing him through a plate glass window. Mr. Oxley has scars on his upper back resulting from this *discipline* that he has since covered with tattoos. This incident was not when Mr. Oxley was a teen boy challenging the authority of his father, rather he was a child in every sense of the word.

The above incident has no direct relevance to this matter, however the conduct of his father was the norm, rather than the exception. Mr. Oxley's mother did little to shield her son from this abuse, herself concerned with the JW community and ensuring her children were in lock step with her beliefs. What this meant for Mr. Oxley was that he had no safe harbor when he needed it and experienced no nurture from his parents when he was a child. It was for this reason that when one of his older brothers began molesting him, he felt as if he had nowhere to turn. For years the abuse continued in silence; the older brother emboldened, knowing that Mr. Oxley would not report his abuse. It was not until Mr. Oxley turned seventeen (17) and ultimately fled his home, following a girl to California, that he freed himself from the grip of his brother's persistence. Did he go more to follow the girl or to escape his family home. Mr. Oxley would answer unequivocally that it as the latter.

California was an even bigger failure for Mr. Oxley. After arriving to Los Angeles, the woman he followed, left him, leaving him to find shelter in a place he barely knew. Granted, the

decision to uproot and move could have been better thought out, however considering the alternative, his move was more akin to flight than anything else.  Consequently, Mr. Oxley was taken in by a man who lived within Los Angeles proper; a man Mr. Oxley would later learn prostituted to supplement his income.  Mr. Oxley is and always has been a heterosexual male.  After moving in with the man in Los Angeles, without an income, Mr. Oxley turned to prostitution to earn an income.  Following suit with his roommate, Mr. Oxley became the subject of many meetings with affluent men from Beverly Hills who would pay to look at Mr. Oxley nude.  Similarly, affluent women would pay to do the same, many requiring sexual engagement with him.  Prostitution was never a trade Mr. Oxley sought out or wanted for himself, however it was for a time the only way he could earn enough to live, or so he thought at that age.  Over a seven-month period, Mr. Oxley's fragile emotional state continued to deteriorate to the point where when he had had enough, he made a call to his family.  For context, this was a call that caused him to balance the reality that if he continued down the road he was on, he was likely to die from an eventual venereal disease versus going home to suffer the rage of his family and torment of a community he never wanted to be a part of.  Ultimately the choice was made, and he was flown from California back to Maine where he would face his family.

As to be expected, there was no warm welcome upon his return home.  His parents ostracizing him and giving him the option to live with either of his brothers, Mr. Oxley chose the brother who had never harmed him to this point.  This would change in short order once Mr. Oxley's brother learned that he had participated in homosexual prostitution.  In a time where homosexuality was not well accepted, he suffered the daily barrage of his brother calling him sexual slurs at every opportunity.  It was clear that he was viewed as the black sheep of the

family; an unwanted burden upon his parents, now his brother, and ostracized from any friends he once had.

  Mr. Oxley has never had an easy road and in turn has suffered from mental health issues for as long as he can remember.  For a time, he was undiagnosed, however he always felt *off*.  He suffers from Bi-Polar disorder and struggles, at times, to control his emotions.  He finds it hard to trust others and feels this is likely due to a lifetime of feeling as if he was on his own and ostracized.  He has, to this day, never received treatment for his mental health issues spawning from his abuses and feels as if he is a leper of society.  Despite his history, Mr. Oxley has always worked in legitimate capacities and has provided for his family.  His life seemed to be going in the right direction until he was charged with and pled to a child pornography case in Orlando.  Obviously, this prior offense makes difficult Mr. Oxley's prayer for mercy, however this case must be discussed as it plays a part in this matter.

  Mr. Oxley pled in the prior child pornography matter, receiving probation with the requirement that he complete sex offender therapy.  For reasons I have not yet been able to determine, Mr. Oxley's probation was allowed to be terminated prior to completion of his sex offender treatment.  Without the tether of probation, he was of no state of mind to continue attending.  While in treatment he was in an environment that was not supportive.  Rather, he felt as if the participants in the therapy were made to be shamed for their actions, accused of further actions that were not true, and brow beaten rather than supported.  In any sex offender treatment, participants are made to tell their story to open themselves up to treatment.  This is done in an accepting and warm environment so that the individual can feel comfortable participating and thus the treatment see success.  This is no different than any other therapy.  This was most certainly not the case for Mr. Oxley, a fact that undoubtedly contributed to him having no desire

to return. In sex offender therapy, it is not uncommon that a 'hierarchy' of sorts begins to form, often with the longer engaged, middle aged men, dominating the meetings. This was much the case for Mr. Oxley, contributing to his ultimate ineffective treatment.

Mr. Oxley's treatment group was such a disaster that he recalls a man named Michael Wayne Collins, who worked on a construction crew with him and attended sex offender therapy with him, spread rumors throughout their work crew that Mr. Oxley had committed hands on offenses in the past. On a daily basis, Collins would harass him and tell anyone that would listen that Mr. Oxley was a pedophile, despite having no official diagnosis of being so to this day. When Mr. Oxley brought this up to his sex offender group therapist, Collins denied this conduct and the matter was swept under the rug.[4]

This is not offered as an excuse for any conduct related to this case. However, without appropriate treatment to address his issues, his life continued as a rudderless ship of sorts, spiraling again to the point where he finds himself here, facing further charges. There is no way to say whether he would be here had his treatment worked and been continued. Of course he could have continued it, however it is hard to put the onus on a person with a mental health defect to do the right thing in terms of mental health treatment when they, themselves, cannot identify their need in order to address it. So, while Mr. Oxley has a prior charge of the same variety, his lack of effective treatment offered no remedy, nor did it provide him with the tools needed to ensure he would not re-offend. With treatment comes an opportunity to rehabilitate

---

[4] It is notable that Mr. Oxley, when telling this story, remembered Michael Wayne Collins by name, described what he looked like, and had a general idea of his charges. Mr. Oxley has not seen this man in years and has been incarcerated since December 2024. For these reasons I believe what he says of Collins is accurate and the harassment Mr. Oxley endured at Collins' hands is real. Regardless of whether a hands-on offense was committed by anyone within the group, the conduct toward Mr. Oxley did not aid in his rehabilitation.

and thus avoid further encounters with illegal actions.  The notion that a person could effectuate their own care process, lacking the tools to do so, is circular reasoning at best.

Despite Mr. Oxley not having success in his prior sex offender counseling, he did treat with a counselor for some time, meeting with Michelle Buchanon, a licensed mental health counselor located in Clermont.  Emotionally, he was the best he ever has been when treating with her, a notion Mr. Oxley's wife Michelle, would echo.  He felt like he was given tools to move forward, avoid making poor decisions, and felt the most like himself that he ever has.  His Bi-Polar was under control, he had no antisocial urges, and his work life and marriage were healthy.  Mr. Oxley enjoyed the therapy and was active and engaged while participating.  Mr. Oxley ultimately had to cut short his therapy with Ms. Buchanon due to losing his job and insurance.  As could be predicted, when he ceased with therapy, his psychological condition deteriorated like a marble off a table.  Rapid was his decline leading him to the point of trying to sustain; an ultimate failure that leads to his current charges.

**PSYCHOSEXUAL EVALUATION**

As with any sex crime defendant, Mr. Oxley has completed a psychosexual evaluation by Dr. Jennifer Sager, Ph.D.  Dr. Sager is a well-respected psychologist, specializing in sexual deviance and sex crime cases, working as an expert and testifying for both the defense and the State in cases of this variety.  As you will find in the attached psychosexual report, Dr. Sager conducted several recognized and accepted testing measures upon Mr. Oxley, reviewed the discovery in this case, and discussed with him his background, finding him to be a low to moderate risk to reoffend.  As stated above, it is her position that probation in the prior case should have never been terminated and he should have been made to complete sex offender

therapy, albeit with a different counselor and group, especially after the problems brought to the forefront by Michael Wayne Collins.

Dr. Sager's evaluation identified maladaptive cognitive schemas (undoubtedly related to his childhood and time in California) and dependency on deviant online stimuli. Undoubtedly this is the case considering his prior child pornography charge and now the instant offense. Mr. Oxley's real struggle is with internet-based material, and primarily when he is not fully mentally healthy. This factor is important as the primary issue to attack and treat. Mr. Oxley's profile most closely aligns with a class of offenders whose primary risk can be managed with evidence-based cognitive behavioral interventions, digital accountability measures, and long-term clinical oversight. Dr. Sager emphasized that with a structured outpatient program and polygraph-monitored compliance, Mr. Oxley has a strong likelihood of rehabilitation; something he has, to this day, failed to receive effectively. While I am aware that Mr. Oxley is going to prison, it is my submission that a lengthy prison term will be less effective as a measure of punishment than a lesser incarcerative sentence, piggy backed by extensive sex offender treatment under the eye of sex offender supervised release. To attack the root cause of his criminal conduct is to treat those things that are the catalyst for the conduct.

**ACCEPTANCE OF RESPONSIBILITY**

Mr. Oxley has resolved this case by way of plea as he understands that to try his case would be futile. His outlook on that issue has not wavered since his detainer. While, as Dr. Sager mentioned, Mr. Oxley tries to keep a positive self-image, this has clouded marginally his explanation of his conduct, notably when he was interviewed by homeland security. Despite this, he was cooperative and allowed access to his phone and engaged in the initial interview. The fact that he has not engaged in distribution and felt/feels remorse for his conduct reinforces

the conclusion that his conduct was driven by untreated compulsive tendencies, rather than an organized or exploitative motive.

Since his arrest, Mr. Oxley has expressed clear remorse and recognizes the harm caused by child sexual abuse material—regardless of the medium or how it is sourced. More importantly, he has renewed his willingness to engage in structured sex offender therapy, this time with the benefit of enhanced supervision, accountability tools, and clinician oversight.

We respectfully submit that Mr. Oxley is not a case study in defiance or denial, but rather a failed product of an incomplete rehabilitative system. To be sure, while Mr. Oxley has nearly nothing at his disposal in terms of rehabilitative means while sitting in the county jail, he has still availed himself of peer counseling with the National Alliance of Mental Illness (hereinafter "NAMI"), a peer group that while not clinical, offers support and positive application of rehabilitative principals to individuals in need. Due to NAMI not being clinical, there are limitations in what it can provide, however it is an outlet that allows individuals to be heard and supported, two things Mr. Oxley has lacked through his life. All in all, Mr. Oxley is aware that his participation in NAMI will not be a domino tip for him, however he is viewing his participation in the light most favorable to his wellbeing and future and for that he must be acknowledged for accepting his wrongdoing and working toward his own improvement to the best he can considering his limited resources.

Mr. Oxley's current offense warrants consequences, but it also invites a more constructive approach—one that recognizes the reality of relapse in the absence of full treatment and the still-present capacity for rehabilitation. He is willing to engage in every form of court-mandated therapy, monitoring, and accountability structure. What failed in 2012 can be corrected now, if the sentence imposed is one that truly addresses the underlying risks and offers

the necessary support. He is willing to engage, to the extent he can based upon resources available to him, in any therapeutic measure he can, addressing specifically his sexual deviance or mental health generally. He is aware that his prior charge hurts his argument for a lesser sentence considerably. However, it can be viewed in context with other mental health issues and the treatment they require. In the same way other mental health issues require aid and guidance to be corrected, so too do Mr. Oxley's troubles. This was not done in any effective manner on his first case and as such it should not come as a great surprise that he recidivated. Avoidance of recidivism is significantly bolstered by treatment and the tools provided therein.

2. **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment.**

Mr. Oxley is charged with a child pornography offense calling for an incarceration sentence between 210 and 262 months. Mr. Oxley is not blind to the harm caused by his actions and the terrors involved with child pornography. With time comes reflection and with treatment to address his wrongs, starting with thought process and ending with the end use, Mr. Oxley can be treated and is willing to be treated. Of course, this must be done in a capacity where his mental health needs are first met so that he can get his mindset on a healthy plane, then he can address those urges and antisocial actions that led to his crimes.

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment*

*Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005).

Mr. Oxley is aware that his crime is a serious one, regardless of his role. Sitting in jail for a year, missing family events, struggling to maintain his marriage, and generally miss out while his loved ones move on with their lives in his absence allows for reflection for a person willing to invest in themselves. What is notable about Mr. Oxley is that he is accountable. He is both accountable and bears his shame increasingly every day and with every meeting. He cannot change his wrongs, but he can work toward the lessened likelihood that he will repeat his misgivings. He wants help; appropriate and effective help. Mr. Oxley knows he bears 90% of the responsibility to ensure his treatment is effective, however he is eager to improve. In short, he offers not excuse, rather focused on a plan for what he can do to better himself upon his release.

   3. **The Need to Afford Adequate Deterrence to Criminal Conduct.**

The principle of general deterrence is based on the unsupported premise that lengthy prison sentences deter crime. This concept has resulted in the mass incarceration of individuals in the United States.

> For the past 40 years, the United States has been engaged in a vast, costly social experiment. It has incarcerated a higher percentage of its people, and for a longer period, than any other democracy. In fact, with 5 percent of the world's population, the U.S. is home to 25 percent of its prisoners. There are five times as many people incarcerated today than there were in 1970. . . [The] archipelago of prisons and jails costs more than $80 billion annually — about equivalent to the budget of the federal Department of Education.

Dr. Oliver Roeder et al., *What Caused the Crime Decline*?, Brennan Center for Just., 22-23 (Feb. 12, 2015), *available at* https://www.brennancenter. org/publication/what-caused-crime-decline.

The condition of mass incarceration is especially troubling since there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom?"*, 59 Crime & Delinquency 1006, 1031-33 (2013). Kleck and Barnes' study concludes:

> there is generally no significant association between perceptions of punishment levels and the actual levels of punishment that the criminal justice system achieves. This in turn implies that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between actual punishment levels and perceptions of punishment levels appears to be weak to nonexistent.

*Id*. at 1031. The United States Department of Justice agrees with the conclusion that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014). In fact, the Department of Justice finds that even increasing the severity of punishment does little to deter punishment. *See id*.; *see also* Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963) ("No punishment has ever possessed enough power of deterrence to prevent the commission of crimes").

Respectfully, considering the findings of the aforementioned studies and even our United States Sentencing Commission, a long prison term will not deter Mr. Oxley from recidivating for the simple premise that it does not deter others either.

### 4. To Protect the Public from Further Crimes of the Defendant.

Having established that prison sentences, regardless of length, have no impact on general deterrence, this section demonstrates that the § 3553(a) factor of specific deterrence also supports Mr. Oxley's request for a variance. This section focuses on studies establishing that incarceration has no effect on recidivism.

<u>The Relationship Between Incarceration and Recidivism</u>

As in the case of general deterrence, the empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections, *Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016). As the following discussion establishes, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

A 2016 study conducted by the National Institute of Corrections (NIC) establishes three critical tenets regarding incarceration and specific deterrence. First, incarceration has a negligible impact on crime prevention. *See also* Vera Instit. of Justice, *Overview of The Prison Paradox: More Incarceration Will Not Make Us Safer* (July 2017) (concluding that research shows a "weak relationship between incarceration and crime reduction, and highlights proven strategies for improving public safety that are more effective and less expensive than incarceration").[5] Instead, a longer prison sentence may actually lead to a greater risk of recidivism. *See id*. There is strong evidence that prison - by disrupting education and employment, reducing prospects for future employment, weakening family ties, and exposing less serious offenders to older more serious offenders- leads to increased recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007).

Moreover, harsh penalties do not improve the long-term outcomes of the offender. Longstanding research has found that imprisonment brings about negative individual-level

---

[5] The United States Sentencing Commission has determined that "[t]here is no correlation between recidivism and guidelines' offense level. . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (May 2004).

changes that can harm re-integration upon release. National Research Council. *The Growth of Incarceration in the United States: Exploring Causes and Consequences,* (Nat'l Acad. Press 2014), available at. https://doi.org/10.17226/1861; *see also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887). ("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance").

Finally, the 2016 study concludes that community correction programs are more effective than incarceration in reducing recidivism. *See* R. S. Frase et al, *Criminal History Enhancements Sourcebook* (2015) (discussing studies establishing the crime that "custody is associated with higher rates of re-offending than community sentences."). Thus, the most effective way to promote public safety and ensure that convicted persons can lead law-abiding lives is through broad use of non-incarceration sentences, especially since "incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections.

The numbers from these studies do not show a benefit to longer incarceration, and given Mr. Oxley's situation, while he will serve a considerable sentence, a shorter sentence would allow him to return to society in some form, enter into the treatment he so desperately needs, and try to live out the remainder of life he will have upon his release.

### *The Kinds of Sentences Available*

Mr. Oxley is not eligible for probation because it has been expressly precluded by statute.

### **CONCLUSION**

As the foregoing establishes, Mr. Oxley respectfully requests this court impose a bottom end guideline sentence and order that both within his incarceration, and upon release, Mr. Oxley

receive mental health treatment and sex offender treatment conducted by a qualified practitioner in accord with Florida Administrative Code 64B4-7.0081.

Respectfully submitted this 15th day of December, 2025.

/S/ Jason M. Mayberry
Mayberry Law Firm, LLC
Jason M. Mayberry
FL Bar# 36212
Attorney for Defendant
402 E. 7th Ave
Tampa, FL 33602
Ph- 813.444.7435
Fx- 727.755.0098
jason@mayberryfirm.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing has been furnished by Electronic Filing Service to the Office of the United States Attorney, this 15th day of December, 2025.

/S/ Jason M. Mayberry
Jason M. Mayberry